1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11   REMBRANDT DIAGNOSTICS, LP.,          Case No.:  3:16-cv-0698-CAB-(NLS)

12                          Plaintiff,    **CLAIM CONSTRUCTION ORDER**

13   v.

14   INNOVACON, INC., ,

15                         Defendant.

16

17         This litigation involves a breach of contract claim brought by Plaintiff Rembrandt

18   Diagnostics, L.P. ("Rembrandt") against Defendant Innovacon, Inc., for royalties alleged

19   due on the sale of urine test cups. A 2004 Patent License Agreement between Rembrandt's

20   predecessor-in-interest, Assurance Biotech, LLC, and Innovacon's predecessor-in-interest,

21   Applied Biotech, Inc., grants Applied Biotech, and its affiliates rights to certain patents,

22   including U.S. Patent No. 6,548,019; and its foreign counterparts: Canadian Patent No.

23   2,324,413; EP Patent No. 1,028,806; and Taiwanese Patent No. 461827.  [Doc. No. 41, Ex.

24   3.[1]]  According to the terms of the 2004 Agreement, Applied Biotech, and its affiliates,

25   have an exclusive, worldwide right to make and sell urine test cups for use in the drugs of

26

27   _____

28
     [1] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

                                          1

abuse market that are covered by the claims of the '019 patent and its foreign counterparts, in exchange for royalty payments.

Rembrandt alleges that products sold by Innovacon in the United States, Canada, the United Kingdom and Tawian are "urine test cup for use in the drugs of abuse market" that "would infringe claim[s] of …[the] Licensed Patents absent [the 2004] Agreement."  [*Id.* at ¶1.5.]  It is further alleged that no royalty payments have been made as required by the 2004 Agreement.  Innovacon contends that it has made no sales of products that infringe any claim of the '019 Patent or its foreign counterparts.  To assist in the determination of whether royalty payments are owed pursuant to the Agreement, the parties requested the Court construe certain claims of the patents at issue.

The parties submitted their proposed claim construction briefs in accordance with the Court's scheduling order [Doc. Nos. 144, 145, 156, 157].[2]  On November 13, 2017, the Court held a Claim Construction hearing in this matter.  [Doc. Nos. 160, 161.]  For the reasons stated on the record and set forth below, the Court construes the submitted claim terms as follows.[3]

**A. The '019 Patent[4]**

The '019 Patent has one independent claim.  [*Id.* at 8-9, Col. 8:41- Col. 9:2.]  The parties requested the Court construe the terms set forth in bold.  The invention claimed in Claim 1 is:

---

[2] Innovacon's Motion [Doc. No. 159] to Strike the Declaration of Jin Po Lee [Doc. No. 158] as untimely is **GRANTED**.

[3] Prior to the hearing the parties agreed to the construction of "ambient pressure" as *the pressure of the surrounding medium, such as a gas or a liquid*, and "an ambient pressure within the flow control channel equivalent to the ambient pressure outside of the flow control channel" as *the pressure of the medium within the flow control channel is equivalent to the pressure of the medium outside the flow control channel.*  [Doc. No. 144 at 5-6; Doc. No. 133-1 at 9 and 11.]  The Court hereby adopts those stipulated constructions.

[4]  Doc. No. 144-4 at 2-10.

1. **A device for collecting and assaying a sample of biological fluid**, the device comprising:

(a) a flow control channel defined by at least one liquid pervious side joined to liquid impervious sides, wherein the internal dimensions of the flow control channel are sufficient to permit placement therein of an assay test strip;

(b) an assay test strip within the flow control channel, wherein the assay test strip has a **sample loading zone** therein, and wherein further **the assay test strip is disposed within the flow control channel** so that sample fluid contacts the sample loading zone at a liquid pervious side of the flow control channel; and,

(c) a sample fluid container having a base, an open mouth, and walls connecting the base to the mouth;

**wherein the flow control channel is disposed inside the sample fluid container with the liquid pervious side oriented [toward] the base of the sample fluid container so that the assay sample fluid, when added to the container, is delivered to the sample loading zone of the assay test strip by entry through a liquid pervious side of the flow control channel** without migration through **an intermediate structure**, and wherein entry of fluid into the flow control channel creates an ambient pressure within the flow control channel equivalent to the ambient pressure outside of the flow control channel, thereby eliminating a pressure gradient along which excess sample fluid could flow into the flow control channel.

The parties also requested the Court construe the following term of Claim 2.

2. A device according to claim 1, wherein the sides of the flow control channel are **loosely fitted** around the assay test strip.

> ### a. **A device for collecting and assaying a sample of biological fluid**

Rembrandt contends that the preamble of the claim, **a device for collecting and assaying a sample of biological fluid,** is limiting as it is "necessary to give life, meaning and vitality" to the claim. *Catalina Mktg Inter. v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002). Specifically, Rembrandt argues that the preamble limits the claimed **device** to a "single unitary structure for conducting a test." [Doc. No. 144 at 17.] This is supported, according to Rembrandt, by the specification's reference to "a combination assaying device and collection chamber which is capable of easily collecting and testing a biological fluid sample, such as urine, while maintaining the sample unadulterated and secure," and the Figures of the patent which depict unitary arrangement. [*Id*. at 15.]

Innovacon contends that the preamble of the claim is not limiting, rather the preamble states a purpose or intended use for the set of limitations in the body of the claim that completely sets forth the invention. *See Catalina Mktg*, 289 F.3d at 808 (where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use, the preamble is not limiting.) **Device** in this claim phrase, according to Innovacon, is not a limitation but merely a descriptive name for the set of limitations in the body of the claim. *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) ("The phrase 'control apparatus' in the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention.")

The Court agrees with Innovacon, that the preamble is not limiting. The preamble recites the intended purpose of the invention and the body of the claim defines a structurally complete invention. Although the specification discloses as an embodiment of the invention a combination assay test strip/assay sample fluid collection cup, the specification also recognizes that "those of ordinary skill in the art will appreciate that flow control means of the invention common to each embodiment may be utilized in any test-strip based immunoassay format in which restricting the flow of fluid through the test strip is desired." [Doc. No. 144-4 at 7, Col. 5:15-20.] The claim is not limited to a single unitary structure for conducting a test, as Rembrandt proposes. The claim would be infringed by any device encompassing all the limitations in the body of the claim. *IMS Tech.*, 206 F.3d at 1434. The Court finds **a device for collecting and assaying a sample of biological fluid** to be a descriptive name for the set of limitations and an intended use. No construction of the preamble is required.

b. **sample loading zone**

**Sample loading zone** is explicitly defined in the patent to be *an area of a* [sic] *assay test strip on which a fluid analyte sample is applied for migration to the test zone.* [Doc. No. 144-4 at 5, Col. 2:35-39, 50-52.] The Court finds no reason to deviate from the express definition provided in the patent.

### c. the assay test strip is disposed within the flow control channel

The parties agree the limitation requires that the assay test strip be contained in the flow control channel. The disagreement was whether "disposed within" should be construed to require the strip be contained entirely in the channel or if it can protrude at the pervious end such that the sample loading zone of the strip extends beyond the channel in the manner described in the specification and depicted in Figure 3. [*Id*. at 3 and 7, Col. 6:14-16, 38-40; Figs. 3 and 4.] The plain language of the entire claim and the prosecution history inform this construction issue.

Originally filed as Claim 3, the claim recited "an assay test strip disposed within the flow control channel, wherein the assay test strip has a sample loading zone therein, and wherein further the assay test strip is disposed within the flow control channel so that sample loading zone *is flush with, or protrudes from,* a liquid pervious side of the flow control channel." [Doc. No. 147-4 at 39, emphasis added.] The claim further recited that "assay sample fluid is introduced into the assay test strip solely by wicking therethrough on contact of the sample loading zone with assay sample fluid." [*Id.* at 40.]

In response to an Office Action rejecting the claims, the patentee amended, and the apparatus claim, now Claim 1, remained relatively unchanged as "an assay test strip within the flow control channel, wherein the assay test strip has a sample loading zone therein, and wherein further the assay test strip is disposed within the flow control channel so that sample loading zone *is flush with, or protrudes from,* a liquid pervious side of the flow control channel." [Doc. No. 147-5 at 45, emphasis added.]

To distinguish the invention over prior art, the patentee highlighted that in the invention sample fluid is delivered to the sample loading zone through the liquid pervious side of the control channel. The pressure in the channel limits the rate "at which sample will flow into the channel to contact the sample loading zone." [*Id*. at 58, 63.] The claim was amended to add that the assay sample fluid when added to the container "is delivered directly to the sample loading zone through a liquid pervious side of the flow control channel," and the "assay sample fluid is introduced into the flow control channel and onto

the assay test strip solely by wicking on contact of the sample loading zone with assay sample fluid." [*Id*. at 65.]

The claims were again rejected. [Doc. No. 147-6 at 15-19.] In response, the patentee initially offered no further amendments but challenged the examiner's interpretation and application of the prior art. [*Id*. at 27-38.] The examiner was not persuaded and specifically found that prior art disclosed direct contact of a fluid sample to the sample loading zone without migration through an intermediate structure. The claims therefore stood rejected. [*Id*. at 41.]

Following an interview, the patentee submitted an amended Claim 1 to "define Applicants' invention with greater particularity." [*Id*. at 51.] Claim 1 was amended to recite an **"**assay test strip within the flow control channel, wherein the assay test strip has a sample loading zone therein, and wherein further the assay test strip is disposed within the flow control channel so the *sample fluid contacts the* sample loading zone [is flush with, or protrudes from] *at* a liquid pervious side of the flow control channel." [*Id*. at 55.] The "flush with or protrudes from" language was removed.

The claim was further amended in a supplementary filing to clarify "that the assay sample fluid, when added to the container, is delivered [directly] to the sample loading zone of the assay test strip *by entry* through a liquid pervious side of the flow control channel." [*Id*. at 69.] Direct delivery to the sample loading zone was replaced with delivery by entry through the liquid pervious side of the flow control channel.

The claim was allowed, in part, because the prior art did not teach or suggest a device in which "the sample fluid is delivered to the sample loading zone of the test strip by entry though [sic] a liquid pervious side of the flow control channel." [Doc. No. 147-7 at 2.]

Rembrandt does not address the plain language of the claim as finally allowed, that requires the sample fluid be delivered to the sample loading zone, not directly, but by entry through the flow control channel. Rembrandt relies on the written description and the illustrated preferred embodiment to construe **disposed within** as encompassing an assay

test strip with its sample loading zone protruding from the flow control channel in direct contact with the fluid sample.

A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F3d. 1576, 1583 (Fed. Cir. 1996). However, the language of the claim as amended no longer supports a protruding sample loading zone that directly contacts the fluid outside the channel. The plain language of the claim is for a device in which the flow control channel is disposed inside the container with the liquid pervious side oriented toward the base[5] and when liquid is added it is delivered to the sample loading zone by entry through the liquid pervious side of the flow control channel. These amendments were made after numerous rejections based on prior art that the examiner argued disclosed sample fluid directly contacting the sample loading zone. Although the patentee disagreed with the examiner's understanding of the scope and operation of the prior art, he ultimately amended the claim to remove direct contact between the fluid and the loading zone and claim the contact occurs by entry of the fluid through the flow control channel.

In this case the unambiguous language of an amended claim and the prosecution history result in the exclusion of a preferred embodiment that teaches the loading zone can protrude from the channel. *See Elekta Instrument S.A., v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed Cir. 2000) (amendment disclaiming preferred embodiment compelled adopting construction excluding that embodiment). Based on the plain language of the claim and the prosecution history, the Court therefore construes **the assay test strip is disposed within the flow control channel** as *the assay test strip is disposed entirely within the flow control channel.*

---

[5] The plain language of the amended claim also precludes a preferred embodiment in which the liquid pervious side and the sample loading zone are oriented toward the mouth of the container. [Doc. No. 144-4 at 4 and 8, Col. 7:29-40, Fig. 7.]

3:16-cv-0698-CAB-(NLS)

d.     **intermediate structure**

An **intermediate structure** is construed as *a wicking material or other transferring means between the fluid and assay test strip.*   The patent explicitly defines the sample loading zone as part of the assay test strip. [Doc. No. 144-4 at 5, Col. 2:50-56.]  Therefore the construction is further clarified that the sample loading zone of an assay test strip does not meet the definition of an intermediate structure.  [See Hearing Transcript, Doc. No. 161 at 34-36.]

e.     **wherein the flow control channel is disposed inside the sample fluid container with the liquid pervious side oriented [toward] the base of the sample fluid container so that the assay sample fluid, when added to the container, is delivered to the sample loading zone of the assay test strip by entry through a liquid pervious side of the flow control channel**

Rembrandt argues that this wherein clause requires that the assembled device, i.e., the flow control channel with the inserted assay test strips, must be placed in the container prior to the fluid being added.  Innovacon argues that this is not a method claim and the language only requires that the structural elements function in accordance with the limitations whether the flow control channel is introduced to the container before or after the fluid is introduced.

This is an apparatus claim not a method claim.  "Apparatus claims cover what a device is, not what a device does."  *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990).  The claimed device has certain structural limitations that perform a particular function when exposed to fluid.  The specification provides that the flow control channel can be positioned in the container prior to the fluid sample being added, or alternatively it can be immersed into the fluid already in the container.  [Doc. No. 144-4 at 7, Col. 6:40-45 and Col. 5:62-64.]  If one makes and sells the device, presumably without fluid, the device could be found to infringe if it has all the structural limitations to function as disclosed.

The Court finds **when added to the container** is a functional limitation describing how the device must function when it comes into contact with liquid, not a temporal requirement as to when the liquid is introduced to the container.

### f. **loosely fitted**

The Court determined that **loosely fitted** in the context of the patent did not require construction and has no special or unusual meaning to be understood by a trier of fact. [*Id.* at 36-42.] Claim 1 requires that the flow control channel have "internal dimensions … sufficient to permit placement therein of an assay test strip." [Doc. No. 144-4 at 8, Col. 8:44-48.] Dependent Claim 2 requires that 'the sides of the flow control channel are **loosely fitted** around the assay test strip." [*Id.* at 9, Col. 9:3-5.] The Court finds a trier of fact can understand and make that determination without further construction.

## B. The '413 Patent[6]

The '413 patent is the Canadian counterpart of the '019 patent. Claim 1 claims:

1. A device for collecting and assaying a sample of biological fluid comprising:

(a) **contiguous** flow control channels for each of a multiplicity of assay strips, each channel being defined by at least one liquid pervious side joined to liquid impervious, wherein the internal dimensions of the flow control channel are sufficient to permit placement therein of an assay test strip;
(b) assay test strips disposed within the flow control channels, wherein the assay test strips have a sample loading zone therein, and wherein further each assay test strip is disposed within the flow control channel so the sample loading zone protrudes from the liquid pervious side of the flow control channels; and,
(c) a liquid sample container having a base, an open mouth closable with a cap and walls connecting the base to the mouth, said liquid container being large enough to contain said liquid control channels and protruding assay strips, wherein the volume capacity of the assay sample liquid collection container is such that the total liquid pressure obtainable within the container is maintained at or below 1 atmosphere, wherein further each flow control channel is placed into the assay sample liquid collection container such that a liquid pervious side of each flow control channel will be placed in contact with the assay sample liquid when added to the container or when the container is inverted;

---

[6] Doc. No. 144-4 at 12-34.

3:16-cv-0698-CAB-(NLS)

(d) wherein the ambient pressure within each flow control channel is equivalent to the ambient pressure outside the flow control channel; and

(e) wherein further the assay sample liquid is introduced into each assay test strip solely by wicking there through on contact of the sample loading zone with the assay sample liquid.

The parties requested construction of **contiguous**, which the Court construed as *next to or together in sequence.* [Doc. No. 161 at 42-45.]

It is **SO ORDERED**.

Dated:  December 7, 2017

_____
Hon. Cathy Ann Bencivengo
United States District Judge

3:16-cv-0698-CAB-(NLS)